Filed 7/22/26  In re K.F. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | B348899 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 25CCJP02441) |
| Plaintiff and Respondent, | |
| v. | |
| V.F. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet Judge.  Affirmed.

Erin Riley Khorram, under appointment by the Court of Appeal, for Defendant and Appellant V.F.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant Kevin I.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel for Plaintiff and Respondent.

————————————

V.F. (mother) and Kevin I. (father) challenge the juvenile court's September 2025 dispositional order as to their son, K.F. Mother contends the juvenile court erred by removing K.F. from her physical custody, and father contends the juvenile court abused its discretion by requiring him to drug test. We find no error, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Background.

K.F. was born in April 2021. In June 2025,[1] the Los Angeles County Department of Children and Family Services (DCFS) received a report that mother and a male friend were using methamphetamines while mother was caring for four-year-old K.F. Mother's friend sprayed mother with mace, causing her to jump out of a second story window. Mother was injured and taken to the hospital.

Mother told a social worker that she had argued with her former boyfriend, Terrell, and asked him to leave her apartment. Terrell pushed open the bedroom door while holding a can of bear mace. After the mace can discharged, mother had difficulty

---

[1]    All subsequent date references are to 2025 unless otherwise indicated.

breathing, but she did not want to walk past Terrell because she was afraid he might hit her. Instead, she opened the window and jumped out. K.F. was with the downstairs neighbor when this happened. Mother denied that she and Terrell had used drugs the day of the incident, and she also denied that there had been any prior incidents of domestic violence with Terrell. Mother refused to say where K.F. was because she distrusted DCFS.

Mother's downstairs neighbor, Kirsten, reported having heard mother and her boyfriend argue the day of the incident. When the argument became physical, mother brought K.F. to Kirsten's apartment. Kirsten then saw mother jump from her window. K.F. rode to the hospital with mother in the ambulance.

A longtime family friend, Paula W., said K.F. had tested positive for substances at birth and was taken home from the hospital by a family member after mother left the hospital early. Paula became involved with K.F.'s care six weeks later. K.F. had been in and out of Paula's care and the care of extended family members, including maternal uncle Derrell and maternal aunt Cienna, over the last four years. Paula described repeated instances where mother cared temporarily for K.F. before relapsing into drug use. Paula said mother had a significant history of methamphetamines use; while Paula had not personally seen mother use drugs, she had witnessed the behavioral aftermath, including mother's erratic behavior, pupil dilation, and prolonged periods of absence.

Mother's property manager, Sandra G., said mother was regularly under the influence of drugs. Neighbors had complained about mother bringing men from the street into her apartment, and they reported hearing fighting and yelling in mother's unit at night. When Sandra visited the property, she

3

usually found K.F. in the courtyard unsupervised while mother smoked marijuana in the stairwell. Sandra said mother's bedroom window had been broken and replaced three different times.

Maternal Aunt Cienna said K.F. frequently stayed with her and maternal uncle Derrell. Recently, K.F. had lived with them for about six months and had attended day care near their home. Since June 20, K.F. had been staying with his father in Palmdale. Cienna had never seen mother use drugs, but she suspected mother did because of her erratic behavior and emotional instability.

Maternal uncle Derrell said he did not know mother to use drugs and had no concerns about K.F. in mother's care. He had last seen K.F. a month or two earlier.

In early August, mother told the social worker that she was homeless and was staying with friends and family. She would not disclose her current whereabouts. She tested positive for marijuana on August 1.

The social worker visited father's home in early August. Father said K.F. had lived with him for some time and had not been with mother when she jumped from her apartment window. Father said he allowed K.F. to visit mother only occasionally because he was concerned about K.F.'s well-being in mother's care. K.F. currently was in Palmdale with father's former partner, Dominique, who was the mother of two of his children. Father's current partner, Lita, said K.F. lived primarily with her and father, but visited mother on the weekends. Lita said father was an active and caring father, and she had no concerns about K.F.'s safety in his care. Lita had never seen mother under the influence of drugs.

Father has a lengthy criminal history. He has several substance-related arrests, including for marijuana possession in 2009, for driving under the influence of alcohol in 2024, and for possession of a controlled substance in June 2025. He has also repeatedly been accused of incidents of domestic violence, including assaulting Lita in November 2021, January 2022, May 2024, and September 2024, discharging a firearm in the home where five children were present in May 2024, assaulting an ex-girlfriend in July 2024, and assaulting an adult daughter in May 2025. He was convicted of vandalism in 2001, battery and infliction of corporal injury on a cohabitant in 2006, robbery and possession of a firearm in 2012, and firearm possession in 2023.

The social worker conducted an unannounced visit at the home of father's former partner, Dominique, on August 2. Dominique said K.F. had been living with her and her four daughters since early July 2025 at mother's request. Before that, K.F. had been living with the maternal uncle. Dominique denied having any knowledge that mother or father used drugs. K.F. appeared well cared for.

On August 6, Dominique told the social worker that mother had asked her to bring K.F. to Los Angeles for a visit with the maternal grandmother. Dominique met mother at a grocery store and left K.F. with her. The next day, mother told the social worker that K.F. was with her, but she would not say where they were. Mother said she planned to return K.F. to Dominique in a few days to start school.

On August 13, the court issued a warrant to remove K.F. from his parents. The social worker tried to serve the warrant on Dominque on August 14, but Dominque said mother had not returned K.F. to her. Dominique also reported that father had

come to her home unannounced the prior weekend and broken a window.  Dominique had obtained a restraining order and planned to move to a new home.

On August 14, the social worker spoke to mother, who confirmed K.F. was with her but again refused to say where they were.

## II.    Petition; detention; jurisdiction and disposition hearing.

DCFS filed a dependency petition on August 18.  As subsequently amended, the petition alleged that K.F. was a juvenile court dependent pursuant to Welfare and Institutions Code[2] section 300, subdivision (b)(1) because mother had a history of substance abuse and was a current abuser of marijuana, and father failed to protect K.F. from mother's substance abuse (count b-1); and father had a violent criminal history, including shooting into an inhabited dwelling while his children were present (count b-2).

On August 19, the court ordered K.F. detained with his maternal uncle and aunt under DCFS supervision.  Mother and father were permitted unmonitored visits with K.F. if they submitted to drug tests and tested clean.

The social worker attempted to reach mother on August 22, 26, and 27.  On August 27, mother agreed to meet with the social worker the following day, but then cancelled the meeting. Mother again failed to show up for a meeting with the social worker on September 2.  The social worker tried unsuccessfully to reach mother by phone on September 3 and 4.

---

[2]     All subsequent statutory references are to the Welfare and Institutions Code.

On August 26, father told the social worker that he was not willing to participate in any programs because K.F. was under DCFS supervision due to mother's conduct, not his.

The maternal uncle reported in early September that mother had been visiting K.F. two or three times per week for about three hours. Father had not visited, but spoke to K.F. on the phone once or twice a week.

The juvenile court held a jurisdiction/disposition hearing on September 10. Mother testified that since K.F.'s birth, she, the maternal uncle, and family friends had helped care for K.F. Mother testified: "We're a village. We help each other out." Mother admitted smoking marijuana in the past, but said she stopped when the court ordered her to. She had never used any other drugs other than experimenting with Ecstasy in high school. Her most recent drug test was negative.

After hearing argument, the juvenile court sustained both counts of the petition and ordered K.F. removed from mother and father. The court ordered mother to complete anger management and parenting classes, submit to random drug tests, and participate in individual counseling. It ordered father to complete anger management and parenting classes, participate in individual counseling, and submit to 10 random drug tests; if father consistently tested clean, no further tests would be required. Both parents were permitted unmonitored visits with K.F.

Father objected to being required to complete any programs or to drug test. Both parents objected to the removal order.

Both parents timely appealed from the jurisdiction and disposition orders.

## DISCUSSION

### I.    Mother's appeal.

Mother's sole contention on appeal is that the juvenile court erred by removing K.F. from her custody. We find no error.

Section 361, subdivision (c)(1) provides that a child shall not be taken from the parents' physical custody unless the juvenile court finds, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.)

We review a dispositional order removing a child from a parent for substantial evidence, " ' "keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." ' (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)" (*In re M.V.* (2022) 78 Cal.App.5th 944,

960.)  In applying this standard of review, " 'the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' [Citation.] We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Ibid.*)

Mother's sole contention on appeal is that K.F. could have been protected without removing him from her custody because she was willing to voluntarily place him with maternal uncle Derrell, whom DCFS and the court considered an appropriate guardian.  Substantial evidence supported the juvenile court's contrary conclusion.  Significantly, mother never agreed to voluntarily place K.F. with Derrell; instead, she said that she would keep K.F. in her *own* custody if the court released him to her, and would place K.F. with Derrell only if the court "ordered something different."  Moreover, the events leading up to the removal order supported the juvenile court's conclusion that a voluntary placement would not keep K.F. safe.  Mother left K.F. with Dominique in early July, but then asked Dominique to return K.F. to her on August 6, four days after DCFS made an unannounced visit to Dominique's home.  The following day, mother refused to tell the social worker where she and K.F. were, but said she would return K.F. to Dominique by August 11 so he could start school.  As of August 14, however, K.F. was still with mother, who continued to refuse to say where they were.  DCFS was not able to locate K.F. until mother brought him to the detention hearing on August 19.  In light of this evidence—

9

particularly mother's deliberate moving of K.F. between placements while refusing to disclose where he was—the juvenile court could reasonably have concluded that even if mother had voluntarily placed K.F. with the maternal uncle, she would not have allowed him *to remain* in his uncle's custody absent a court order. The court thus did not err by removing K.F. from mother's custody.

## II.    Father's appeal.

Father contends the trial court abused its discretion by ordering him to drug test because there was no evidence he had a substance abuse problem. We disagree.

If a child is adjudged a juvenile court dependent, the court may make "any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) The juvenile court has "wide latitude" to make such orders in the child's best interests and "*is not limited to the content of the sustained petition* when it considers what dispositional orders would be in the best interests of the children." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311, italics added.) Instead, the court's "broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion, permits the court to formulate disposition orders to address parental deficiencies when necessary to protect and promote the child's welfare, even when that parental conduct did not give rise to the dependency proceedings." (*In re K.T.* (2020) 49 Cal.App.5th 20, 25.) We review the juvenile court's disposition orders for an abuse of discretion, and review for substantial evidence the findings of fact on which dispositional orders are based. (*Ibid.*)

10

In *In re Christopher H.* (1996) 50 Cal.App.4th 1001, the juvenile court dismissed an allegation that the father's alcohol abuse had placed his child at risk of harm, but it nonetheless ordered the father to submit to drug and alcohol testing as a condition of reunification.  The father challenged the order, urging that the drug or alcohol testing condition was beyond the court's jurisdiction because the court found unproven the allegation that father had an alcohol problem that negatively affected his ability to care for the child.  (*Id.* at p. 1006.)  The Court of Appeal disagreed and affirmed, explaining that when the court "is aware of other deficiencies that impede the parent's ability to reunify with his child, the court may address them in the reunification plan." (*Id.* at p. 1008.)

In the present case, as in *Christopher H.*, although the juvenile court did not premise jurisdiction on any substance abuse by father, it had a reasonable basis for suspecting that father may have been using alcohol or drugs—namely, that father had been arrested for driving under the influence of alcohol in 2024, and for possession of a controlled substance in June 2025.  Under these circumstances, and in light of K.F.'s very young age and inability to protect himself, the court did not abuse its discretion by ordering father to submit to ten drug tests to rule out current substance abuse.

*In re Basilio T.* (1992) 4 Cal.App.4th 155, on which father relies, is distinguishable.  There, nothing in the record indicated that the parents had a substance abuse problem other than the social worker's observation that mother's behavior was unusual.  Because this observation did not support a conclusion that either parent abused substances, the Court of Appeal held that the juvenile court erred by including a substance abuse component in

11

the reunification plan. (*Id*. at pp. 172–173.) In the present case, in contrast, there was a reasonable basis for suspecting that father has a substance abuse problem, and so the juvenile court did not err by requiring him to drug test.

## DISPOSITION

The dispositional order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ASHWORTH, J.*

We concur:

ADAMS, Acting P. J.

HANASONO, J.

---

\*      Retired Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.